Donald H. Mead, J.
The parties hereto have submitted a controversy to this court for determination upon a stipulated statement of facts pursuant to CPLR 3222. The agreed facts are as follows:
1. That the plaintiffs, Douglas V. Whitelegg and M. Marie Whitelegg, were at the times hereinafter mentioned and still are owners in fee of certain premises known as 303 Elm Street in the City of Rome, County of Oneida and State of New York. That said premises consist of a one-family, three-story wood dwelling.
2. That the defendant is a Michigan corporation duly registered to do business in the State of New York and, among other things, sells standard fire insurance policies as prescribed by the Superintendent of Insurance of the State of New York and the statutes of the State of New York.
*703 3. That on or about the 23rd day of September, 1963, the defendant, in consideration of the premium of $54.20, paid to it by the plaintiffs, duly made, executed and delivered to plaintiffs its certain fire insurance policy numbered P-689327, a copy of which is hereto attached and marked as Exhibit A whereby it duly insured the plaintiffs from all direct loss resulting from the explosion of accumulated gases or unconsumed fuel within the fire box (or combustion chamber) of any fired vessel or within the flues or passages which conduct the gases of combustion therefrom, not exceeding $18,000.00 under an 80% co-insurance clause for a term of one year from the 23rd day of September, 1963 to the 23rd day of September, 1964.
4. That the aforedeseribed premises was equipped with an oil fired boiler or furnace located in the cellar of said premises which constit-ted the heating system for the said premises.
5. That during the month of January 1964, and for several weeks immediately prior thereto, the said premises remained vacant and unoccupied. That during the period that the premises were unoccupied, the plaintiffs kept the oil burning furnace lighted and in operation at a temperature of about 60 degrees up to the time of the occurrence hereinafter described. That during January 1964 and for several weeks immediately prior thereto the plaintiffs had secured the services of a real estate agent for the purposes of finding a purchaser for the said premises with full permission to enter the said dwelling while it was unoccupied and vacant.
6. That on or about January 7, 1964 the said real estate agent went into the premises and dwelling hereinbefore described and noted that the inside temperature was extremely cold. He also found the pipes, radiators, and heating system damaged and cracked tanks and bowls of two toilets and metal fixtures of two sinks. On or about January 8, 1964, John Mondriek, licensed plumber, inspected the premises at the plaintiffs’ request and found that the fire box door to the oil fired boiler was located on the cellar floor about 4 feet in front of the boiler and that the draft control was also on the floor below the smoke pipe at the rear of the boiler. It is conceded that there was an explosion in the oil burner unit that damaged the oil burner and the boiler door, which explosion was caused by faulty or delayed ignition and that the cost to overhaul the burner and repair the boiler door and any necessary connecting of joints in the combustion chamber and to clean the boiler and to put the unit back into operation was $75.00.
7. The exact time of the explosion in the fire box of the oil burner is not known. It could have occurred on January 7, 1964 or at any time within 4 days prior thereto. At the time the damage was discovered on or about January 7,1964, it was also noted that the water pipes and radiators throughout the heating system were damaged throughout the dwelling as a result of the freezing up of these pipes and radiators, which freezing followed the fall in temperature throughout the dwelling which occurred after the explosion in the fire box of the oil burner extinguished the fire in said oil burner.
8. The cost of repairing or replacing the pipes, radiators and heating system was $1,936.75.
9. That the plaintiffs gave the defendant proper notice of the said loss and damage by reporting same to the defendant’s agent, Rome Insurance Service, 225 North Washington Street, Rome, New York, which inspection was made on behalf of the defendant on January 7, 1964.
10. That representatives of the defendant proffered a sworn statement indicating a proof of loss to the plaintiffs for signature, copy of which is attached hereto and marked Exhibit B and that the plaintiffs refused to execute *704 such proof of loss in the amount of $75.00, to wit, the cost of repairing the damage to the oil burner.
11. That the defendant has refused and still refuses to pay for the cost of repairing or replacing the damaged pipes, radiators or heating system, which damage amounts to $1,936.75.
12. It is the defendant’s contention that the aforedescribed fire insurance policy covers only direct loss caused by explosion and that the damage to the water pipes and radiators was consequential damage to the building and not damage that was caused directly from the explosion. It is the plaintiffs’ contention that the aforementioned damage to the water pipes and radiators was a loss resulting directly from the explosion because it is intimately linked with the explosion, and, therefore, compensable under the fire policy irrespective of its characterization as a “ direct loss ” or “ consequential damage ”. The defendant agrees that they owe the plaintiff $75.00 damages as hereinbefore set forth and the plaintiffs claim the defendant owes them $1,936.75 damages as hereinbefore set forth.
Attached to the agreed statement of facts are the following documents:
(a) Exhibit “A” — Form No. D — September 1961 Edition; provisions applicable to contract between the parties;
(b) Exhibit “B” — Proof of Loss proffered to plaintiffs by defendant, but not accepted;
(c) Exhibit “ C” — memorandum concerning the issuing of the aforedescribed insurance policy by defendant to plaintiffs;
(d) Exhibit “D ” — copy of John Mondrick’s estimate of repair to the damaged oil burner which defendant agrees is owed to plaintiffs.
The principal question for the court’s determination is whether the loss or damage caused by the freezing of water within plumbing and heating pipes of an insured dwelling, where such freezing resulted from the failure of an oil-burning furnace to function because of an explosion in the combustion chamber, is a direct loss or damage by explosion, so as to permit recovery for such loss or damage under the terms of a fire insurance policy, the coverage of which, under its language, ‘ is extended to insure against direct loss by * * * explosion”.
The extended coverage endorsement as it applied to explosions is in the following language:
Loss by explosion shall include direct loss resulting from the explosion of accumulated gases or unconsumed fuel within the firebox (or combustion chamber) of any fired vessel or within the flues or passages which conduct the gases of combustion therefrom.
This Company shall not be liable for loss by explosion of steam boilers, Bteam pipes, steam turbines or steam engines, if owned by, leased by or operated under the control of the Insured.
The following are not explosions within the intent or meaning of these provisions:
(a) Shock waves caused by aircraft, generally known as “ sonic boom,”
(b) Electric arcing,
*705 (e) Rupture or bursting of rotating or moving parts of machinery caused by centrifugal force or mechanical breakdown,
(d) Water hammer,
(e) Rupture or bursting of water pipes,
(f) Rupture or bursting due to expansion or swelling of the contents of any building or structure, caused by or resulting from water.
(g) Rupture, bursting or operation of pressure relief devices.
Any other explosion clause made a part of this policy is superseded by this endorsement.
The extended coverage endorsement further provided that:
A claim for loss by any peril insured against by this endorsement shall not be barred because of change of occupancy, nor because of vacancy or unoeeupancy.
The parties hereto, in legal memoranda, have cited numerous cases bearing on the general question at issue but unfortunately none of the cited authorities have fact patterns similar, or close enough, to the case at bar to be analogous. The court has been unable to find any New York cases directly in point and none have been furnished by respective counsel.
The issue turns on the construction to be placed on the words of the policy, “ direct loss ”. It has been said that a proper definition of “ direct loss ” is “ loss proximately caused by the peril insured against”. However, as is stated in New York Jurisprudence (vol. 30, Insurance, § 1084) proximate cause has a different meaning in insurance cases than it has in tort cases. ‘ ‘ In tort cases, the rules of proximate cause are applied for the single purpose of fixing culpability and for that reason the rules reach back of both the injury and the physical cause to fix the blame on those who created the situation in which the physical laws of nature operated; in insurance cases the concern is not with the question of culpability or why the injury occurred, but only with the nature of the injury and how it happened. If the nearest efficient cause of the loss is one of the perils insured against, the courts look no further. If the nearest efficient cause of the loss is not a peril insured against, recovery will nevertheless be had if the dominant cause is a risk or peril insured against. In other words, in determining the cause of a loss for the purpose of fixing insurance liability when concurring causes of damage appear, the proximate cause to which the loss is to be attributed is or may be the dominant or efficient cange — the one that sets others in motion — although other and incidental causes may be nearer in time to the result and operate more immediately in producing the loss.” (See Tonkin v. California Ins. Co., 294 N. Y. 326, 329.)
Policies of insurance, like other contracts, must receive a reasonable interpretation consonant with the apparent object *706 and plain intent of the parties. In approaching that inquiry account must be taken of ‘ the reasonable expectation and purpose of the ordinary businessman ” when making an ordinary business contract. “ It is his intention, expressed or fairly to be inferred, that counts. There are times when the Iuav permits us to go far back in tracing events to causes. The inquiry for us is how far the parties to this contract intended us to go; The causes within their contemplation are the only causes that concern us.” (Bird v. St. Paul Fire & Marine Ins. Co., 224 N. Y. 47, 51.) “ The words of the policy are to be read in context, the language construed fairly and reasonably, with an eye to the object and purpose sought to be accomplished by the writing.” (Harris v. Allstate Ins. Co., 309 N. Y. 72, 75-76.) This is entirely consistent Avith the rule that ambiguities should be construed most strongly against the underwriters and most favorably to the assured. The controlling fact here is whether the explosion was the predominating and operative cause of the loss and damage. As was said in the case of Insurance Co. v. Boon (95 U. S, 117, 130-131): “ The question is not what cause was nearest in time or place to the catastrophe. That is not the meaning of the maxim causa próxima, non remota spectatur.”
“ The proximate cause is the efficient cause, the one that necessarily sets the other causes in operation. The causes that are merely incidental or instruments of a superior or controlling agency are not the proximate causes and the responsible ones, though they may be nearer in time to the result. It is only Avhen the causes are independent of each other that the nearest is, of course, to be charged with the disaster. A careful consideration of the authorities will vindicate this rule. Mr. Phillips, in his work on Insurance, sect. 1097, in speaking of a nisi prius case of a vessel burnt by the master and crew to prevent its falling into the hands of the enemy, Gordon v. Rimming-ton, 1 Camp. 123, says, the * maxim causa próxima spectatur affords no help in these cases, but is, in fact, fallacious; for if two causes conspire, and one must be chosen, the more scientific inquiry seems to be, whether one is not the efficient cause, and the other merely instrumental or merely incidental, and not which is nearer in place or time to the consummation of the catastrophe.” And again, in sect. 1132: ‘ In case of the concurrence of different causes, ■ to one of which it is necessary to attribute the loss, it is to be attributed to the efficient predominating peril, whether it is or is not in activity at the consummation of the disaster.’ In Brady v. North-western Insurance Co., 11 Mich. 425, Maetix, C, J., in delivering the opinion of *707 the court, said: ‘ That which is the actual cause of the loss, whether operating directly or by putting intervening agencies, the operation of which could not be reasonably avoided, in motion, by which the loss is produced, is the cause to which such loss should be attributed.’ In St. John v. American Mutual Insurance Co., 11 N. Y. 519, the insurance was against fire, but the policy exempted the insurers from any loss occasioned by the explosion of a steam-boiler. A fire occurred, caused by an explosion, which destroyed the insured property. The court, regarding the explosion, and not the fire, as the predominating cause of the loss, held the insurers not liable. Decisions are numerous to the same effect.”
In Mork v. Eureka-Security Fire & Marine Ins. Co. (230 Minn. 382), there was an explosion in the heating and plumbing system followed by a freezing of the water pipes. The fire insurance policy contained an indorsement that “ coverage of this policy is extended to include direct loss or damage by * * * explosion”. The court, in declaring that “direct” in the policy means “immediate” or “proximate” as distinguished from “remote”, citing the Minnesota case of Ermentraut v. Girard Fire & Marine Ins. Co. (63 Minn. 305) wrote (pp. 387, 388):
“If this [the explosion] occurs in freezing weather, there is but one natural result, unless human efforts intervene and restore heat. The contract here involved must be considered from the standpoint of the parties at the time of its execution, in the light of surrounding circumstances, as was stated in the Bussell [v. German Fire Ins. Co., 100 Minn. 528] case. When this contract was entered into, it could reasonably have been foreseen that, if in freezing weather the furnace were put out of commission by an explosion and the heat supply thus cut off, the water in the heating and plumbing systems would freeze and burst the pipes. It is reasonable to say that the parties contracted with reference to the contingency of an explosion in the furnace, with a resulting stoppage of heat. If they contracted with reference to such a contingency, did they not also contract with reference to what inevitably must follow such an explosion if it occurs in subzero weather Í * * *
“ The freezing in the instant case was not remote to' the occurrence of the explosion, but an immediate and direct result. To say that subzero weather in Minnesota in midwinter is something that the parties did not contract with reference to is to ignore realities. The result here was more readily foreseeable than that in the Bussell case. [100 Minn. 528.] There is more certainty that water pipes will freeze if an explosion puts a *708 heating unit out of commission in frigid weather than that a wall left standing after a fire will be blown down by the wind. In our opinion, the loss was within the reasonable intent of the parties when they made their contract. ’ ’
In the case at bar the defendant places considerable emphasis on the provision of the indorsement which states that the rupture or bursting of water pipes is not an explosion within the intent or meaning of the contract. However, there is no claim made here that the rupture or bursting of the pipes constituted an explosion but rather that such bursting of the pipes was the end result of the explosion which concededly occurred within the combustion chamber of the furnace.
In Lipshults v. General Ins. Co. of America (256 Minn. 7) the plaintiff sued to recover under a windstorm policy for damage to perishable foodstuffs in insureds’ store following an interruption of electrical service due to a wind-caused break in power lines supplying the area in which insureds’ store was located. The court held that the loss to insureds’ foodstuffs as a result of the power failure constituted a “ direct loss by windstorm ” within the terms of the policy. The court stated (p. 11): “ the word ‘ direct ’, in the policy, means merely ‘ immediate ’ or ‘ proximate ’, as distinguished from ‘remote’.” In referring to cases in other jurisdictions the court referred to Godwin v. Atlantic Coast Line R. Co. (120 Ga. 747, 751) wherein the court, in Godwin, wrote (p. 12): “ the phrase ‘ proximate cause ’ does not necessarily mean that which is nearest, but refers rather to the efficient cause, and in this sense is sometimes referred to as the ‘ immediate and direct ’ cause, as opposed to ‘ remote ’. And the words ‘ proximate, ’ ‘ immediate, ’ and ‘ direct ’ are frequently used as synonymous.”
In Jordan v. Iowa Mut. Tornado Ins. Co. (151 Iowa 73) the court considered a policy of insurance covering loss to livestock by windstorm which excluded loss from snow. It appeared from the evidence that a storm occurred in the month of January which involved both snow and high winds as a result of which the insured’s cattle were injured and perished. The Iowa Supreme Court found that the loss was due to windstorm and said (p. 84):
“Appellant says, however, that the policy if so construed does not cover any loss or damage save that due directly to a . windstorm such as a direct physical injury to the stock as by throwing them to the ground, driving them against some obstacle or the hurling of some object against them. As we víoav it, this is entirely too narrow a construction. It ignores *709 a fundamental tenet for the construction of insurance policies to the effect that if a policy is so drawn as to require interpretation and be fairly susceptible of two different constructions, that one will be adopted which is most favorable to the insured. * * *
“ Again, it is contended that the storm was not the proximate cause of the loss or damage; that the injury to the cattle was due directly, if not solely, to the conditions of the temperature. This was a question of fact to be determined from the testimony, and without setting it out it is sufficient to say that the trial court was justified in finding that the loss would not have happened but for the windstorm, and that this windstorm was the efficient cause of the damage. That other - irresponsible causes may also have contributed to the loss does not, of itself, relieve defendant from responsibility.”
In Federal Ins. Co. v. Bock (382 S. W. 2d 305 [Tex. Ct. of Civ. App.]) an action was brought to recover on policies insuring against direct loss resulting from windstorm and hurricane. Insured, who was in the business of processing and cold-storing meats, suffered a loss when part of his meat in the cold storage vaults spoiled due to a rise in temperature because the electrical transmission lines were damaged by hurricane resulting in complete stoppage of electricity. From an adverse judgment the insurer appealed. The Court of Civil Appeals, G-been", C. J., held that the spoilage of meat was a direct loss by windstorm and hurricane and was covered by the policies. The court stated (p. 307): “ The test applied under the rule of proximate cause seems to be that where, and only where, an insured peril sets other causes in motion which in unbroken sequence and connection produce the final result for which the insured seeks to recover under his policy, the peril insured against will be regarded as the direct and proximate cause of the entire loss, so as to render the insurer liable for the entire loss within the limits fixed by the policy. The rationale behind this rule is that the scope of insurance protection is defined by the application of the proximate cause standard, according to which a specified loss is compensable if and only if caused by a peril covered by the policy.”
This court is not unmindful of the decision in Williams v. Liberty Mut. Fire Ins. Co. (334 Mass. 499), where the court held that “ direct loss by windstorm ” meant immediate physical damage resulting from high wind and expressly excluded the effects of cold weather. In Williams the plaintiff sued to recover under the provisions of an extended coverage endorse *710 ment contained in a fire insurance policy for damage. to plaintiff’s house allegedly resulting from windstorm. It appeared in that case that shutters were blown from a louver in the loft of the house by windstorm and as a result of increased cold, a water pipe in the loft was frozen causing the pipe to burst resulting in damage to the interior of the house. The court, in denying plaintiff a recovery, stated (p. 503) : “ We think that there is no ambiguity in the term ‘ direct loss ’ as used in the policy. It refers to the immediate physical damage resulting from the effect of the wind, in this case the loss of the shutter. That it toas intended to exclude consequential damage is shown by the express exclusion of losses due to frost, cold weather, ice, snowstorm, sleet, waves, tidal wave, and high water or overflow, all being conditions which naturally might be expected to follow in the wake of a windstorm.” (Emphasis supplied.)
In the case at bar it should be pointed out with some significance that the provisions of the extended coverage endorsement applicable to “ windstorm and hail ” excluded any “ loss caused directly or indirectly by frost or cold weather, or ice (other than hail), snow or sleet, whether driven by wind or not ”. If defendant had intended to exclude loss or damage resulting from cold weather similar language could have been employed in the provisions of the policy dealing with “ explosion ”.
The court has carefully considered the cases submitted and analyzed the defendant’s memorandum and feels that they are distinguishable on the facts and not controlling. Insofar as statements contained in the opinion of Williams (supra) are concerned, we believe they are contrary to the weight of authority and reason. In the instant case the chain of events culminating in the disputed loss was set in motion by the explosion. We are unable to find wherein the policy contains a limitation of coverage excluding this type of loss, one which the insurer might have inserted if deemed advisable by an appropriate exclusionary clause in the endorsement. The fact that such an exclusionary clause was employed in the provisions dealing with “ windstorm and hail ” lends considerable support to plaintiffs’ contention that it was not overlooked by the underwriters.
For the reasons stated, the plaintiffs are hereby awarded judgment in the amount of $2,011.75, together with interest and statutory costs.